**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**SHEFENA KONG,**
Plaintiff,

v.                                                    Civil Action No. 3:26-cv-384

**ADVANCED REPRODUCTIVE CARE, INC.,**
Defendant.

## COMPLAINT

## PRELIMINARY STATEMENT

1.      Advanced Reproductive Care, Inc. ("ARC") is a company whose entire business depends on women's health—yet when one of its own female employees outperformed her male counterpart, ARC cut her pay, handed him her responsibilities, and fired her when she complained. Shefena Kong and Bill Glueck were hired to do the same job at ARC: scale its expansion into the employer group fertility benefits market. They reported to the same supervisor, attended the same meetings, and were measured against the same performance targets. In her first three months, Kong closed two sales, completed all assigned RFP responses, and led the testing effort on a critical software upgrade. Glueck closed no sales, completed no testing, and repeatedly caused technical failures that cancelled client meetings. ARC's response was to cut Kong's pay by ten percent, strip her of sales responsibilities, pile Glueck's administrative work onto her desk, and exclude her from the strategy discussions that defined her role—while spending over $100,000 to fund Glueck's conference travel, consulting contracts, and vendor requests. When Kong raised concerns about the covert surveillance of her work laptop—a monitoring policy applied to her device alone—ARC fired her two days later.

1

**JURISDICTION AND VENUE**

2.      This Court has original jurisdiction over the federal claims in this action under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3).

3.      This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they arise from the same case or controversy as the federal claims.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events giving rise to the claims occurred in the District of Connecticut, where Kong performed her work and where the discriminatory and retaliatory acts were directed.

**ADMINISTRATIVE EXHAUSTION**

5.      On or about February 7, 2025, Kong filed a timely complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was assigned CHRO No. 2530479. The complaint was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC") and assigned EEOC Charge No. 16A-2025-00666.

6.      Kong's CHRO complaint alleged sex discrimination and retaliation in violation of the CFEPA, including Conn. Gen. Stat. §§ 46a-60(b)(1), 46a-60(b)(4), and 46a-60(b)(8). Her EEOC charge alleged sex discrimination and retaliation in violation of Title VII.

7.      On or about January 15, 2026, the EEOC issued Kong a Notice of Right to Sue. This action is filed within ninety days of Kong's receipt of that notice.

8.      On or about December 15, 2025, the CHRO issued a Release of Jurisdiction over Kong's complaint. This action is filed within ninety days of Kong's receipt of the release.

9.      Kong has satisfied all conditions precedent to the filing of this action.

**PARTIES**

10.    Plaintiff Shefena Kong is a female individual residing in Connecticut.

11.    Defendant Advanced Reproductive Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20195 Stevens Creek Boulevard, Suite 220, Cupertino, California 95014. ARC is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the CFEPA, Conn. Gen. Stat. § 46a-51(10). At all times relevant to this action, ARC employed fifteen or more employees.

**FACTUAL ALLEGATIONS**

12.    ARC is a fertility benefits company that has operated in the direct-to-consumer fertility benefits market for approximately twenty-six years. During the period relevant to this action, ARC was expanding into the employer group benefits market—a new line of business that its Chief Executive Officer, David Adamson, M.D., described as a "bootstrapped" venture dependent on the efforts of its sales and strategic initiatives staff.

13.    Kong began working for ARC on July 26, 2023, as Director of Strategic Initiatives. Her job duties included assisting with ARC's employer group benefits business, supporting a Salesforce CRM implementation for the employer group line, and generating sales. ARC has admitted these facts.

14.    Kong's offer letter set her annual salary at $175,000. The offer letter also provided that Kong would "receive 25,000 options at the current price of $0.32 per option for the year 2023 in Advanced Reproductive Care." The offer letter further contemplated a bonus structure tied to team sales targets. Kong accepted a lower salary than she had earned in prior positions in substantial reliance on the promise of equity in ARC.

15.     Kong holds a dual Bachelor of Science degree in Finance & Insurance and Computer Information Systems. She has more than ten years of experience in both the business and technical aspects of the employer group line of business within the health insurance industry. Her prior experience includes leading full-scope health insurance claim system replacement initiatives covering sales, member services, provider relations, claims, pharmacy, finance, compliance, and information technology across individual, employer, Medicare/Medicaid, and exchange product lines.

16.     Kong reported to April Lee, ARC's Chief Operating Officer. Lee reported to Dr. Adamson, ARC's Chief Executive Officer.

17.     Bill Glueck, a male individual, held the title of Executive Vice President of Partnership and Platform (also referred to as Senior Vice President of Partnerships and Integrations). ARC has characterized Glueck as an "independent contractor."

18.     Regardless of how ARC classified Glueck, he functioned as Kong's peer within the employer group initiative. Glueck reported to the same supervisor, April Lee. He attended the same executive team and sales meetings on a Monday-Wednesday-Friday schedule. He was introduced to the company alongside Kong at all-staff meetings. He was subject to the same performance metrics and bonus structure, which Dr. Adamson set based on collective sales targets to be split among Lee, Glueck, and Kong.

19.     Like Kong, Glueck was hired to scale ARC's employer group benefits business and support and grow employer group sales. Both Glueck and Kong attended the same RFP and sales deck training sessions. Both were required attendees at the same sales prospect meetings and were assigned similar sales-related tasks.

20. Glueck had comparable experience to Kong in the employer group health insurance space. He had previously run a broker sales team at a large health insurance company and had started a benefit enrollment system company that sold to employers.

21. Glueck was also responsible for supporting the Salesforce CRM system upgrade for the employer group line, including designing, building, and delivering the EDI (electronic data interchange) component that would connect ARC's software to employer groups, brokers, and third-party vendors.

***Kong's Strong Early Performance (July–September 2023)***

22. During her first three months at ARC, Kong performed at a high level relative to both her own job responsibilities and in comparison to Glueck.

23. Kong completed one sale and was well into her second employer group sale within her first ninety days. In the same period, Glueck had not completed any sales. Kong completed all of her assigned RFP responses and follow-ups. Glueck continued to make errors on his RFPs, which Lee would correct and eventually assigned Kong to fix.

24. Kong completed extensive testing on ARC's Salesforce software upgrade. She collaborated with the business team on dozens of test cases. In the same period, Glueck—who had been with ARC since late 2022 and served as the subject matter expert on partnerships and integrations for the upgrade—had not completed any test cases. Glueck was not required to attend the daily (and sometimes twice-daily) testing meetings that Kong attended.

25. Kong had her systems, phone, SharePoint access, and videoconferencing properly configured, as Lee had stressed was necessary for the busy season. Glueck, by contrast, repeatedly scheduled meetings using platforms that Lee and Dr. Adamson could not access,

experienced recurring audio failures, and caused high-priority client meetings to be cancelled or rescheduled. Glueck was not reprimanded for these failures.

26.    When Lee took a two-week vacation in September 2023, Kong completed all assigned follow-ups—including those previously assigned to a prior sales representative who had resigned—and kept all RFP, sales support, and testing items on track. Lee expressed to the team that Kong's performance was so strong that it was the first time in her many years at ARC that she did not worry or take out her computer during vacation. Glueck did not complete his assigned follow-ups during this period and was not reprimanded.

27.    Despite Kong's superior performance, she received materially less support from management than Glueck. When Kong sought answers to prospect questions, she was expected to research and complete responses herself. When Glueck had similar needs, Lee and Dr. Adamson made themselves available and even drafted responses for him.

28.    Kong was reprimanded for minor issues—such as not including a meeting agenda or minor scheduling misunderstandings—while Glueck was not reprimanded for more significant failures, including scheduling meetings with prospects who were not suitable for ARC's business model, failing to follow SharePoint protocols, and causing document corruption.

***Disparate Treatment Escalates (October–December 2023)***

29.    Starting in approximately October 2023, ARC's disparate treatment of Kong intensified.

30.    Glueck began referring to Kong as "less senior" and stated that she was suited for "less executive" tasks. Lee and Dr. Adamson did not correct these characterizations. Instead, they began treating Kong's role as subordinate to Glueck's.

6

31.    Kong was assigned all RFP creation, testing, and administrative tasks that had previously been shared with Glueck. This reassignment of duties hampered Kong's ability to focus on sales—one of her primary job responsibilities and performance metrics.

32.    Kong was excluded from sales strategy discussions. Although Lee and Dr. Adamson held meetings every other day (Monday-Wednesday-Friday) with both Kong and Glueck to review sales activities and strategy, Glueck was tasked with creating his broker strategy and preparing projections for Dr. Adamson to present to investors and bankers. Kong was not asked to propose, discuss, or contribute any sales strategy or projections.

33.    Kong's recommendations on the software upgrade were ignored. Despite being designated the primary resource for the upgrade, Lee and Dr. Adamson did not adopt Kong's recommendations and did not acknowledge the volume of work she was completing. Kong raised in emails that she was not being afforded the opportunity to devote time to sales. These concerns were not addressed.

34.    Glueck, meanwhile, was afforded greater autonomy and authority on the software upgrade despite not completing his assigned test cases. On information and belief, Glueck eventually marked all his test cases as tested and completed in a single batch without actually performing the testing.

***Pay Discrimination (November 2023)***

35.    In or about November 2023, ARC reduced Kong's annual salary by ten percent, from $175,000 to $157,500. ARC communicated the pay cut to Kong verbally and never confirmed it in writing. ARC's own counsel subsequently confirmed this reduction in correspondence with Kong's prior attorney.

36.    ARC has admitted that Kong and others received a salary reduction.

37. Upon information and belief, Glueck did not receive a contemporaneous pay reduction. Upon further information and belief, the only other individual at ARC whose pay was cut at or around the same time was Tammy Scardino, the female Vice President of Finance.

38. The pay reduction was imposed despite the fact that Kong had made two sales in the employer group line and completed all of her priority assignments, while Glueck had made no sales and had not completed his assigned testing or follow-ups.

### *Escalating Discrimination (January–March 2024)*

39. From January through March 2024, ARC's discriminatory treatment of Kong continued to escalate.

40. Kong was effectively removed from sales responsibilities. On February 5, 2024, Kong emailed Dr. Adamson to alert him that although he stated at every meeting that he expected both Kong and Glueck to be working on sales, Kong had just left a meeting with Lee and Glueck in which Lee and Glueck stated that they were not sure they even wanted Kong emailing employers at that point. Glueck continued to work on sales.

41. Kong was assigned Glueck's administrative tasks despite her executive role. Lee stated that this was because Glueck was "more senior."

42. Kong was assigned responsibility for the EDI deliverables that Glueck and his subcontractor had been contracted and paid to deliver—work for which Kong had received no training or prior support.

43. Lee assigned Kong to assist other departments with operational items on portions of the software system that Kong had never worked on or seen, further diverting her from her core responsibilities.

44.    During a performance review meeting, Lee asked Kong: "What experience do you think you have that is relevant to working on the software upgrade?" Kong holds a dual degree in Finance & Insurance and Computer Information Systems and had been leading the testing effort for months.

45.    Kong emailed Tammy Scardino, ARC's Vice President of Finance, to inquire whether she was misclassified as exempt, given that she was working overtime and was no longer being treated as an executive-level employee. After conferring with Lee and Dr. Adamson, Scardino informed Kong that ARC still considered her exempt.

46.    While ARC told Kong that it was not generating revenue in the employer group line and that her ten-percent pay reduction would continue, ARC simultaneously continued to fund Glueck's requests and recommendations at a cost exceeding $100,000. These expenditures included payments to the consulting firm Milliman, conference registrations and travel for Glueck, professional memberships for Glueck, consultant contracts for Glueck, and payments to Glueck's subcontractor to complete or modify deliverables that Glueck had previously been responsible for.

***Retaliation (March–April 2024)***

47.    In March 2024, Kong raised concerns about issues with the software launch, including recommendations that contradicted positions taken by Lee.

48.    In response, Lee sent Kong an email and called her, directing her to stop joining all software upgrade meetings on the ground that Kong was "causing delays and confusion." Kong was told not to speak to or correspond with Coastal Cloud, the third-party vendor, despite having served as the primary line of communication with Coastal Cloud as recently as the prior Friday.

49. Kong was humiliated on calls when other participants would direct questions to her and Lee would instruct Kong not to answer, stating that Kong would no longer be permitted to respond.

50. On March 19, 2024, Lee emailed Kong a "first warning regarding your performance." The warning cited purportedly outstanding broker revisits, overdue follow-up emails, and missed calls. Kong responded in writing on March 27, 2024, with a detailed, point-by-point rebuttal supported by email evidence. Among other things, Kong demonstrated that she had never been assigned the Tier 1 broker revisits Lee referenced; that Lee and Glueck themselves had stated on February 5, 2024 that they were unsure whether Kong should be communicating directly with employers; that several of the missed calls were attributable to IT issues ARC was aware of, including a "ghost mouse" defect on the new laptop ARC had sent her; and that Lee had reassigned tasks Kong had begun without informing her.

51. The March 19 performance warning was the first such communication Kong had received in nearly eight months of employment. It came after months of escalating discriminatory treatment and immediately after Kong had raised concerns contradicting Lee on the software launch.

52. On or about March 20, 2024, Kong met with Lee to discuss the warning. Lee asked Kong to provide daily activity summaries for the last thirty minutes of each workday. Glueck was not required to provide any such reports. Kong stated that the requirement lacked any factual basis and was unwarranted. Lee asked whether Kong was refusing, and Kong responded that she was not agreeing to a requirement premised on inaccurate claims of non-performance. Kong asked Lee to discuss with Dr. Adamson what role and responsibilities would best serve ARC. Kong did not hear back.

53.     Beginning in approximately February 2024, Kong observed anomalies with her work laptop that indicated it was being monitored. Kong alerted human resources, Scardino (who handled certain HR/finance functions), and IT. Lee responded that no such monitoring policies were in place.

54.     Kong discovered that a Microsoft Mobile Device Management (MDM) policy had in fact been applied to her laptop. The MDM configuration was not a standard, out-of-the-box setting. Upon information and belief, this policy was applied only to Kong's device and to no other ARC employee's device. The MDM policy permitted continuous recording of video and audio from Kong's work laptop, including when Kong was not working or signed into the device.

55.     On April 16, 2024, Kong specifically inquired about ARC's privacy policy and terms of use, expressly referencing the California Consumer Privacy Act and the California Privacy Rights Act. ARC never provided the requested policies.

56.     Three days later, on April 19, 2024, ARC terminated Kong's employment. Dr. Adamson sent the termination communication by email at approximately 1:00 a.m. Eastern Time on April 20, 2024.

57.     ARC made no attempt to investigate or remediate the unauthorized surveillance of Kong's work laptop.

58.     The cumulative effect of ARC's conduct—including Glueck's repeated characterizations of Kong as "less senior" and suited only for non-executive tasks; the progressive stripping of Kong's substantive responsibilities; her exclusion from sales strategy discussions and software upgrade meetings; Lee's public humiliation of Kong on calls by forbidding her to speak; Lee's questioning of Kong's qualifications during a performance review

11

despite Kong's dual degree and months of leading the testing effort; the covert surveillance of Kong's work laptop through a uniquely applied MDM policy; and ARC's refusal to investigate or remediate the surveillance after Kong reported it—created a hostile and abusive working environment that altered the conditions of Kong's employment.

59.     This conduct was pervasive and continuous from approximately October 2023 through Kong's termination on April 19, 2024. It was motivated by Kong's sex and, in part, constituted retaliation for Kong's opposition to discriminatory practices.

60.     A reasonable person in Kong's position would have found this work environment to be hostile and abusive, and Kong did in fact perceive it as such.

### *Pattern of Gender Discrimination at ARC*

61.     ARC's discriminatory treatment of Kong was not an isolated occurrence. Upon information and belief, ARC has engaged in a pattern of gender discrimination.

62.     Upon information and belief, ARC terminated a male employee of approximately eleven years, Brian, who refused to blame his female staff for issues caused by Lee and Dr. Adamson's failure to fund or provide adequate support.

63.     Upon information and belief, Scardino, the female Vice President of Finance, was made to feel her job was in jeopardy because she raised errors with the software upgrade during testing. Lee sent emails attempting to shift responsibility to Scardino for decisions Lee herself had made.

64.     Upon information and belief, Drew Darland, a female employee who served as ARC's most senior and knowledgeable customer service representative, was denied any upward mobility or promotion despite her qualifications and tenure.

*ARC's Failure to Honor Its Contractual Obligations*

65.     Kong's offer letter stated that she would "receive 25,000 options at the current price of $0.32 per option for the year 2023 in Advanced Reproductive Care." The plain language of the offer letter provided that the options were earned for the year 2023. Kong remained employed through the entirety of 2023.

66.     ARC never provided Kong with a stock option grant notice or stock option agreement. In post-termination correspondence, ARC's counsel produced a "sample" stock option agreement containing a four-year vesting schedule that Kong had never seen, signed, or agreed to. ARC's counsel conceded that the offer letter "does not specifically refer to these vesting conditions."

67.     ARC refused to honor the 25,000 options promised in the offer letter, refused to disclose the total number of outstanding shares or the current share price, and took the position that it could not grant Kong options after her employment ended—despite having terminated her employment.

68.     Kong's offer letter also contemplated a bonus structure. Dr. Adamson set a collective sales target for the employer group team of Lee, Glueck, and Kong, with any resulting bonus to be split among the three. To the extent the bonus was earned in 2023, ARC was obligated to pay it. ARC did not pay Kong any bonus and terminated her before the payout period.

## COUNT ONE

### Disparate Treatment Sex Discrimination in Violation of Title VII

### 42 U.S.C. § 2000e-2

69.     Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

70.     ARC discriminated against Kong on the basis of her sex, female, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), by subjecting her to disparate treatment in the terms, conditions, and privileges of her employment, including but not limited to: reducing her pay while not reducing the pay of her similarly situated male comparator; assigning her a disproportionate share of administrative and testing duties while relieving Glueck of those duties; excluding her from sales responsibilities and strategy discussions; demeaning and undermining her role; failing to credit or act on her work product and recommendations; and terminating her employment.

71.     ARC's conduct was intentional, willful, and taken with reckless indifference to Kong's federally protected rights.

72.     As a direct and proximate result of ARC's unlawful discrimination, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

## COUNT TWO

### Hostile Work Environment in Violation of Title VII

### 42 U.S.C. § 2000e-2

73.     Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

14

74.    ARC, through the acts and omissions of its officers and agents—including Lee, Dr. Adamson, and Glueck—subjected Kong to a hostile work environment on the basis of her sex in violation of Title VII. The hostile conduct included, among other things: Glueck's repeated references to Kong as "less senior" and suited only for non-executive tasks, which Lee and Dr. Adamson adopted and reinforced; the systematic reassignment of Kong's substantive duties to administrative tasks; Kong's exclusion from meetings, strategy discussions, and vendor communications; Lee's public humiliation of Kong on calls by forbidding her to speak; Lee's demeaning questioning of Kong's qualifications; the covert and targeted surveillance of Kong's work laptop; and ARC's refusal to investigate or remediate the surveillance after Kong reported it.

75.    This conduct was severe and pervasive. It altered the conditions of Kong's employment and created an abusive working environment.

76.    A reasonable person in Kong's position would have found the work environment to be hostile and abusive, and Kong did in fact perceive it as such.

77.    ARC is liable for the hostile work environment because the harassment was perpetrated by Kong's supervisors and resulted in tangible employment actions, including her termination.

78.    ARC's conduct was intentional, willful, and taken with reckless indifference to Kong's federally protected rights.

79.    As a direct and proximate result of ARC's unlawful conduct, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

## COUNT THREE

### Retaliation in Violation of Title VII

### 42 U.S.C. § 2000e-3

80.     Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

81.     Kong engaged in protected activity when she raised concerns about the disparate treatment she was experiencing, including complaining about the unauthorized surveillance of her work laptop and the differential treatment in the terms and conditions of her employment.

82.     ARC retaliated against Kong for engaging in protected activity by, among other things: removing her from software upgrade meetings; prohibiting her from communicating with the third-party vendor; humiliating her on calls; subjecting her to targeted covert surveillance; and terminating her employment on April 19, 2024, two days after her last complaint about the surveillance.

83.     ARC's retaliatory conduct, considered both individually and cumulatively, was sufficiently severe or pervasive that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

84.     There was a close temporal connection between Kong's protected activity and the adverse employment actions she suffered.

85.     ARC's retaliatory conduct was intentional, willful, and taken with reckless indifference to Kong's federally protected rights.

86.     As a direct and proximate result of ARC's unlawful retaliation, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

16

## COUNT FOUR

### Sex Discrimination in Violation of the CFEPA

### Conn. Gen. Stat. § 46a-60(b)(1)

87.     Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

88.     ARC discriminated against Kong on the basis of her sex in violation of Conn. Gen. Stat. § 46a-60(b)(1) by discharging her from employment and by discriminating against her in compensation and in terms, conditions, and privileges of employment because of her sex.

89.     ARC's conduct was intentional and willful.

90.     As a direct and proximate result of ARC's unlawful discrimination, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

## COUNT FIVE

### Hostile Work Environment in Violation of the CFEPA

### Conn. Gen. Stat. § 46a-60(b)(1)

91.     Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

92.     ARC, through the acts and omissions of its officers and agents, subjected Kong to a hostile work environment on the basis of her sex in violation of the CFEPA. The hostile conduct is described in the factual allegations above and included persistent demeaning treatment, systematic removal of her substantive responsibilities, public humiliation, targeted covert surveillance, and refusal to investigate her complaints.

17

93.    This conduct was severe and pervasive. It altered the conditions of Kong's employment and created an abusive working environment.

94.    ARC's conduct was intentional and willful.

95.    As a direct and proximate result of ARC's unlawful conduct, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

## COUNT SIX

### Retaliation in Violation of the CFEPA

### Conn. Gen. Stat. § 46a-60(b)(4)

96.    Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

97.    Kong opposed practices she reasonably believed to be prohibited by the CFEPA, including sex-based discrimination in the terms and conditions of her employment and unauthorized surveillance.

98.    ARC retaliated against Kong for opposing those practices by subjecting her to adverse employment actions, including removing her from key projects and communications, humiliating her in front of colleagues, subjecting her to targeted covert surveillance, and terminating her employment.

99.    ARC's conduct was intentional and willful.

100.    As a direct and proximate result of ARC's unlawful retaliation, Kong has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and damage to her professional reputation.

18

## COUNT SEVEN

### Breach of Contract — Stock Options

101.    Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

102.    Kong's offer letter constituted a binding contract between Kong and ARC. The offer letter provided that Kong would "receive 25,000 options at the current price of $0.32 per option for the year 2023 in Advanced Reproductive Care." Kong accepted the offer, commenced employment, and remained employed through the entirety of 2023.

103.    ARC breached the offer letter by failing to grant Kong the 25,000 stock options, failing to provide her with a stock option grant notice or agreement, and refusing to honor the options after her employment ended.

104.    ARC cannot avoid its contractual obligation by invoking vesting conditions contained in a separate document that Kong never received, never signed, and never agreed to, and that ARC's own counsel conceded the offer letter did not reference.

105.    As a direct and proximate result of ARC's breach, Kong has suffered damages in an amount to be determined at trial, including the value of 25,000 stock options and any appreciation thereon.

## COUNT EIGHT

### Breach of Contract — Bonus

106.    Kong incorporates and re-alleges each of the foregoing paragraphs as though fully set forth herein.

107.    Kong's offer letter contemplated a bonus structure tied to team sales targets for the employer group line. Dr. Adamson established a collective bonus target for Kong, Glueck,

19

and Lee. To the extent the bonus was earned during 2023—while Kong was employed—ARC was obligated to pay Kong her share.

108.    ARC breached its obligation by failing to pay Kong any bonus for 2023 and by terminating her employment before the payout period in 2024.

109.    As a direct and proximate result of ARC's breach, Kong has suffered damages in an amount to be determined at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Shefena Kong respectfully requests that this Court enter judgment in her favor and against Defendant Advanced Reproductive Care, Inc., and grant the following relief:

(a)    A declaratory judgment that ARC's actions as described herein violated Title VII and the CFEPA;

(b)    Back pay, front pay, and all compensation and benefits lost as a result of ARC's unlawful conduct;

(c)    Compensatory damages for emotional distress, humiliation, and other non-economic harm;

(d)    Punitive damages;

(e)    Damages for breach of contract, including the value of the stock options promised in the offer letter and any unpaid bonus;

(f)    Pre-judgment and post-judgment interest;

(g)    Reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 2000e-5(k) and Conn. Gen. Stat. § 46a-104;

(h)    Such other and further relief as this Court deems just and equitable.

PLAINTIFF SHEFENA KONG

By: _____
Alexander T. Taubes, Esq.
Taubes Law
470 James Street, Suite 007
New Haven, CT 06513
Tel: (203) 909-0048
Email: alextt@gmail.com
Juris No. 437388
Fed. Bar No. ct30100

21